IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:18CR334 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PFISTER, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel Justin E. Herdman, United States Attorney, and Danielle K. Angeli and Michael A. Sullivan, Assistant United States Attorneys, respectfully requests that this Court sentence Defendant Matthew Pfister ("Defendant") to a term of imprisonment within the Guidelines range of 151 to 188 months and order $64,136.40 in restitution.

## I.    INTRODUCTION

In March 2017, Homeland Security Investigations ("HSI") in Cleveland received information from HSI in Newark, New Jersey, regarding an investigation into a Dropbox user account responsible for creating links to video files depicting child pornography.  An HSI Newark agent received a link to the Dropbox account from another individual, and HSI later identified that Defendant was the Dropbox account user.  Agents served Dropbox with a search warrant for the account and found multiple image and video files depicting child pornography in Defendant's account, and linked the account activity to Northeast Ohio.  (R. 16: Presentence Investigation Report "PSR", ¶ 7, PageID 55).  The investigation revealed that Defendant

previously resided in Streetsboro, Ohio, but in September 2017, moved to Rochester, New York. (*Id.* ¶ 8).

On July 8, 2016, Defendant added a folder to his account named "vi," which contained 44 videos files—34 of which depicted child pornography.  One 55-second video depicts a naked prepubescent girl from the chest down, lying on her back.  The child has the words "F--- ME" written across her chest and stomach with an arrow pointing to her genitals in black ink.  During the video, an adult male grasps his penis and rubs it against the child's genitals.  The adult male also engages in genital-to-genital intercourse with the child.  (*Id.* ¶ 10, PageID 56).  Another video, lasting 1 minute and 32 seconds, depicts a naked prepubescent girl lying on the lap of a naked adult male.  The adult male is wearing a clown mask over his face, and aggressively thrusts his fingers into the genitals and anus of the girl.  During the video, the girl is visibly struggling and can be heard screaming.  The adult male also instructs the girl to kneel in front of him and forcefully thrusts his penis into her mouth.  At the end of the video, the adult male rubs lubrication on his penis and inserts it into the child's genitals and anus.  (*Id.* ¶ 11).

Also on July 8, 2016, Defendant added a folder called "other" that contained 128 image files—110 of which depicted child pornography.  (*Id.* ¶ 12).  One image depicts a nude toddler lying back on a bed with her legs spread, using her fingers to pull her genitals apart for the camera.  (*Id.* ¶ 13).  Another image depicts a nude prepubescent girl lying on her back, engaging in genital-to-anal intercourse with an adult male.  (*Id.* ¶ 14).

On September 30, 2016, Defendant added a folder called "all" that contained 217 videos—203 of which depicted child pornography.  One 45-second video depicts a nude prepubescent girl on her knees, engaging in oral-to-genital intercourse on a dog.  The camera focuses on the sexual act throughout the video.  (*Id.* ¶ 16).  Another two-minute video depicts a

2

nude prepubescent girl lying next to a naked adult male.  During the video, the girl masturbates the adult male's erect penis, and at the end of the video, the adult ejaculates into the mouth and onto the face of the girl.  (*Id.* ¶ 17).

Additionally, the National Center for Missing and Exploited Children ("NCMEC") submitted two separate cyber tips to HSI from AOL discussing the possible possession, manufacture, or distribution of child pornography by Defendant, who used the email address snakechamer2011@aim.com.  (*Id.* ¶ 18).  On December 10, 2015, Defendant emailed 24 files containing possible child pornography to the email address sackinthebox1992@gmail.com; Defendant owned both accounts.  (*Id.* ¶¶ 19-20).  Many of the images depicted nude prepubescent and pubescent females engaged in various activities.  The associated filenames included the terms "nudist, pre-nudism, and young nudists."  (*Id.* ¶ 20).

Further, HSI's investigation revealed that between April 4, 2016, and April 9, 2016, an IP address associated with Defendant utilized peer-to-peer file-sharing software to share 338 files, some of which are known to law enforcement as child pornography.  (*Id.* ¶ 21, PageID 57).

On March 17, 2017, NCMEC received a cyber tip from Dropbox regarding the possible possession, manufacture, or distribution of child pornography by Defendant, a registered Dropbox user.  Dropbox reported that 199 files had been uploaded to Defendant's Dropbox account, and at least some of the files contained child pornography.  In addition, Dropbox reported that Defendant made many of the files publically available.  (*Id.* ¶ 22).

On February 6, 2018, HSI executed a search warrant at Defendant's home in Rochester, New York.  Agents seized memory cards, hard drives, a laptop, a cell phone, and thumb drives. (*Id.* ¶ 23).  The items contained 1,397 images and 111 videos depicting child pornography, including 158 images and two videos depicting sadomasochism and violence, and two videos

depicting bestiality involving children.  (*Id.* ¶ 24).  The longest video depicting child pornography lasted 1 hour and 39 minutes, and the total length of all of the child pornography videos was 13 hours and 33 minutes.  (*Id.* ¶ 25).

## II.    ARGUMENT

### A.    <u>The PSR Correctly Calculated Defendant's Guidelines, Including All of the Specific Offense Characteristics.</u>

Defendant's base offense level is 22 under U.S.S.G. § 2G2.2(a)(2).  (*Id.* ¶ 41, PageID 59). The Guidelines provide several specific offense characteristics to account for more egregious conduct, several of which apply to Defendant.  First, a two-level increase applies under § 2G2.2(b)(2) because Defendant's collection of child pornography includes files of prepubescent minors.  Specifically, the PSR notes that Defendant's collection includes a photo of a nude toddler depicting lascivious display of the toddler's genitalia. (*Id.* ¶ 13, PageID 56, ¶ 42, PageID 59).  Two additional levels are added under § 2G2.2(b)(3)(F) because Defendant uploaded 199 files to Dropbox, some of which depicted child pornography, and made those files publically available. (*Id.* ¶ 43).

Additionally, four levels are added under § 2G2.2(b)(4) because Defendant's collection involves photos and videos of adult males sexually penetrating prepubescent children, which is inherently sadistic.  (*Id.* ¶ 44); *see also United States v. Groenendal*, 557 F.3d 419, 426 (6th Cir. 2009) (holding that "penetration of a prepubescent child by an adult male constitutes inherently sadistic conduct that justifies the application of § 2G2.2(b)(3)").  Next, two levels are added under § 2G2.2(b)(6) because Defendant's offenses involve the use of a computer.  (R. 16: PSR, ¶ 45, PageID 60).  Finally, a five-level increase applies under § 2G2.2(b)(7)(D) because the offenses involved 600 or more images.  (*Id.* ¶ 46).  Specifically, Defendant's collection included 9,722 images of child pornography.  (*Id.*).  Thus, Defendant's adjusted offense level is 37.  (*Id.*

¶ 50).  If the Court determines a three-level reduction for acceptance of responsibility is appropriate, Defendant's total offense level is 34.  (*Id.* ¶ 54).  Defendant has no criminal history, so he is a criminal history category I.  (*Id.* ¶ 59).  Thus, Defendant's Guidelines range is 151-188 months.  (*Id.* ¶ 81, PageID 63).

    **B.**    **<u>The Guidelines Appropriately Reflect the Seriousness of Defendant's</u> <u>Conduct.</u>**

Defendant's objection that the Guidelines result in a sentence that is greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a) is meritless.  *See* (*id.* at 19, PageID 71).  It is "Congress's prerogative to dictate sentencing enhancements based on a retributive judgment that certain crimes are reprehensible and warrant serious punishment as a result[.]"  *United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012) ("*Bistline I*").  "Congress's long and repeated involvement in raising the offense levels in § 2G2.2 makes clear that the grounds of its action were not only empirical, but retributive—that they included not only deterrence, but punishment."  *Id.*  Defendant's argument that the Guidelines are not reliable because they were not the product of an empirical study is unavailing.  Several times, the Sixth Circuit has explicitly rejected similar arguments.  *See United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012) (collecting cases).

Further, Defendant's reliance on *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) is inapposite.  First, the case is not binding on this Court.  Moreover, the Sixth Circuit has specifically rejected arguments set forth by other courts and commentators, including the *Dorvee* Court, noting that "the debate regarding the wisdom of congressionally-mandated enhancements notwithstanding, it is unquestionably Congress' constitutional prerogative to issue sentencing directives such as the sentencing enhancements for quantity of images at issue in this case."  *United States v. McNerney*, 636 F.3d 772, 778 (6th Cir. 2011).  It further opined, "Congress [has]

retained ultimate authority over the federal sentencing guidelines . . . . Congress [thus] retains the ability to influence federal sentencing policy by enacting directives to the Commission . . . which the Commission is obliged to implement." *Id.* (internal citations and quotations omitted).  Thus, Defendant's objection is without merit, and the Court should overrule it.

Additionally, Defendant's argument that the enhancement set forth in § 2G2.2(b)(3)(F) is impermissible double counting is meritless.  *See* (R. 16: PSR, 20, PageID 71).  The Sixth Circuit has explicitly rejected this argument.  *See United States v. Walters*, 775 F.3d 778, 784 (6th Cir. 2015) (citing *United States v. Clark*, 553 F. App'x 538, 539 (6th Cir. 2014)).  The statute proscribes the knowing receipt *or* distribution of child pornography, the Guidelines, however, provide for an enhancement for offenses involving the distribution of child pornography. Because some offenses involve distribution and others do not, "§ 2G2.2 is structured so that the range of harms associated with distribution can be addressed through various enhancements." *Id.* (quoting *Clark*, 553 F. App'x at 539).  Therefore, the Court should overrule Defendant's objection to the application of § 2G2.2(b)(3)(F).

Relatedly, Defendant's argument that the enhancement for use of a computer under § 2G2.2(b)(6) is impermissible double counting is likewise meritless.  The *Walters* Court also rejected this argument.  *See Walters*, 775 F.3d at 786-87 (noting "[t]he enhancement remains relevant—regardless of its frequency of application—because the harm it addresses it real").  Thus, the Court should overrule Defendant's objection to the application of § 2G2.2(b)(6).

**C.**    **A Guidelines Sentence Accounts for Defendant's Extensive Child Pornography Collection Including Files Depicting Children Engaged in Bestiality and Prepubescent Children Engaged in Sexual Intercourse with Adult Males.**

Considering the factors set forth in 18 U.S.C. § 3553(a), a Guidelines sentence is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote

respect for the law, to provide a just punishment for the offense, and to afford adequate

deterrence.

Notably, the nature and circumstances of Defendant's offense are troubling.  Defendant's

child pornography collection includes two videos depicting bestiality involving children, 125

images and one video depicting infants or toddlers, and 158 images and two videos depicting

sadomasochism and violence.  (R. 16: PSR, ¶ 24).   Specifically, Defendant's child pornography

collection includes a 45-second video depicting a prepubescent girl engaging in oral-to-genital

intercourse on a dog.   (*Id.* ¶ 16).   It also includes videos depicting prepubescent girls engaging

genital-to-genital, anal-to-genital, and oral-to-genital intercourse with adult males.  (*Id.* ¶¶ 27,

29-31).   Not only did Defendant receive and possess these files, he also shared some of these

files with others via Dropbox by making his files publically available to others.  In addition to

files shared on Dropbox, Defendant utilized peer-to-peer file sharing software to share 338 files,

some of which were known to law enforcement as child pornography.  (*Id.* ¶ 21, PageID 57).

Thus, the United States submits that a Guidelines sentence is sufficient but not greater than

necessary to account for the nature and circumstances of Defendant's child pornography

offenses.

      **D.**     **<u>A Guidelines Sentence Also Accounts for the Seriousness of the Offense, and Will Promote Respect for the Law, and Will Provide Just Punishment.</u>**

Defendant engaged in crimes that inherently involve the sexual abuse of helpless children

and the documentation of that horror.  Child pornography victims are harmed initially during the

production of images, but the perpetual nature of child pornography distribution on the Internet

causes significant additional harm to victims.  In *New York v. Ferber*, 458 U.S. 747 (1982), the

Supreme Court recognized the serious and continued harm posed by child pornography:  "the

prevention of sexual exploitation and abuse of children constitutes a government objective of

surpassing importance[.]" *Id.* at 757.  It also referenced several studies that indicate that pornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  *Id.* at 760.  Because the sexual abuse is reduced to a recording, the image or video may haunt the child long after the original violation occurred.  *Id.*  Although *Ferber* was decided in 1982, those statements and studies ring true over thirty years later as the seriousness of these offenses has not changed.

As discussed *supra*, Congress' actions further highlight the seriousness of child pornography offenses.  Congress has acted because of testimony given by victims and their families.  The testimony is similar to that which is contained in the victim impact statements submitted for this case.  While the victims' strength of character shines through, profoundly sad themes emerge as one reads the statements.  The victims feel continually victimized and helpless because they cannot remove the record of their childhood sexual abuse from the Internet.

Here, a victim's mother explains that her daughter has been "given a 'life' sentence by the people who download her images of her sexual abuse.  She will forever have the stigma and branding of being someone's sexual object of pleasure.  The lifelong impacts for [her] daughter and tragic[,] and [her parents] are afraid for her future well-being."  She continues, "[b]y having our daughters' sexual abuse images online, monsters will continue to exploit her, leaving her with a tremendous amount of pain to deal with . . . Our daughter has a 'life' sentence of victimization and she will need help to recover from the trauma."  (R. 16-3: Victim Impact Statement, PageID 312-13).  Another mother explains, "[w]e have no way of knowing how many pedophiles used the pictures of her being tortured and degraded as an opportunity for personal gratification.  Someday, the full realization will surely strike her."  She describes, "I dread the day when her anxious question 'have they seen the pictures?' becomes a daily trial for her with

every new face, as I know it already is for me." (R. 16-11: Victim Impact Statement, PageID 1072).

Not surprisingly, the victims and their families often experience paranoia and fear. One victim's mother explains, "I've watched by daughter transformed from a buoyant, cheerful child full of energy and enthusiasm, to an anxious and fretful shadow of her former self. And I've then watched the painful struggle as she's worked to overcome the damage done, and build a new life for herself." (*Id.*, PageID 1071). She further provides:

> If I had my way, each and every image of my daughter's sufferings would be burned. Then she would no longer have to worry about those images being used to further hurt or humiliate her. But as it is, there are those who have no shred of decency, and continue to copy and pass on these pictures. Each person who callously passes on those sickening pictures is exposing my daughter to further shame and humiliation. As long as this continues, the pictures will always be out there. . . . I don't want her to have to worry when she sees a flash of recognition in a stranger's eye that they may recognize her not as a person, but as an object for abuse!

(*Id.*, PageID 1072). Another mother explains, "[m]y children have had their innocence stolen by this defendant, who had no right to have viewed their abuse images. My children have to live the rest of their lives knowing that they were and are still being looked at and watched." (R. 16-16: Victim Impact Statement, PageID 1091).

Similarly, one victim describes, "[b]eing sexually abused is something you never forget, no matter how hard you try. But when you have photographs of your abuse on the Internet, presently being viewed by others, it makes it even more impossible to keep it in your past and move on from it. It is like the abuse is still happening." (R. 16-9: Victim Impact Statement, PageID 1063). She further explains that "[t]he effect of the abuse has not only robbed me of my childhood years, but remains in my young adult years as well. I have had to work through a lot of turmoil in my life. I have suffered greatly with depression and low self-esteem. I used to be

suicidal which led to many psychiatric hospital stays." (*Id.*).  She further describes the pain she

has had to endure as a young adult, "at a time in my young adult life where I was supposed to be

having fun and enjoying life, I was forced to deal with the aftermath of sexual abuse and the

never-ending effects of having pornography pictures of me as a child on the Internet." (*Id.*). She

further explains, "[f]or a short time in college I opted into the victim notification system. . . .

After a month or so and countless notifications, I realized just how many people were viewing

and using these pictures of me.  I couldn't handle it so I opted right back out of it.  It was an

overwhelming and very re-victimizing experience realizing the reality of the situation." (*Id.*,

PageID 1064).

Another victim explains, "I worry about the pictures of me that are out there and I hate

that others see them.  I have feared over the years that someone would recognize me in public.  I

wish only that every single one can be found and destroyed someday." (R. 16-12: Victim Impact

Statement, PageID 1075).  She further describes, "I went to therapy for a while but I stopped

because I just wanted to forget it.  With the pictures still out there I can't." *Id.*  Another victim

explains, "everyday (sic) I get reminded of it, by hearing it on the news and just knowing people

like that out there scares me to death.  It has made me more aware of my envirnment (sic) and

the people around me knowing that some sick person is looking at me on the computer everyday

(sic) in a way that no one should look at a kid makes me feel violated[.]" (R. 16-13: Victim

Impact Statement, PageID 1076).

Despite the victims' strength of character, the effects of having their sexual abuse

recorded makes it difficult for them to handle daily activities like attending school.  *See e.g.,* (R.

16-9: Victim Impact Statement, PageID 1063-64; R. 16-17: Victim Impact Statement, PageID

1095).  Defendant has contributed to the victims' pain and suffering.  Accordingly, a Guidelines

sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

      **E.**      **A Guidelines Sentence Will Afford Adequate Deterrence.**

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *Ferber*, 458 U.S. at 760 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."); *see also Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."); *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) (deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

In *United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007), the Seventh Circuit opined that the greater the customer demand for child pornography, the more that will be produced. *Id.* at 782.  "Sentences influence behavior[:] the logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced." *Id.*  Indeed, the Sixth Circuit reversed a district court that failed to see any importance in general deterrence. *See Bistline I*, 665 F.3d at 767.  During

11

sentencing, the district court explained that it thought that deterrence had little, if anything, to do with the particular case. *Id.* The Sixth Circuit found this statement "inexplicable" and in conflict with its prior statement that "[g]eneral deterrence is crucial in the child pornography context." *Id*. (quoting *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

Similarly, others who have an overwhelming desire for young children will not be deterred if Defendant receives a low sentence.  These offenders communicate with each other online and are concerned about law enforcement detection, to the point of encrypting their hard drives and taking other precautions to prevent detection.  Further, the Court is in the position to send a message to individuals like Defendant who share a morbid fascination and sexual gratification in watching the abuse and torture of children.  No general deterrence is gained by a mere slap on the wrist.  These are serious crimes and should be treated as such.  A Guidelines sentence will increase children's safety by serving to deter others like Defendant.  Thus, a Guidelines sentence will provide adequate deterrence for both Defendant and like-minded individuals.  Additionally, based on Defendant's offense conduct, the United States recommends that this Court order his participation in a sex offender treatment program as part of his sentence.

### F.    Restitution

Victims of child pornography crimes suffer harms that last a lifetime:  "[T]he materials produced are a permanent record of the child[']s participation and the harm to the child is exacerbated by their circulation." *Ferber*, 458 U.S. at 759.  Indeed, "pornography poses an even greater threat to a child victim than does sexual abuse or prostitution." *Id.* at 759 n.10 (internal citation and quotations omitted).  "[T]he use of children as subjects of pornography materials is harmful to the physiological, emotional, and mental health of the child." *Id.* at 758.  As a result, victims incur significant expenses in connection with these harms.

### 1.  Restitution Calculation

Restitution is mandatory "for any offense under [Chapter 110]."  18 U.S.C. § 2259(a).
Chapter 110 includes violations of Sections 2251, 2252, and 2252A.  *See* Title 18, Chapter 110
(Sexual Exploitation and Other Abuse of Children).  The statute provides that "[t]he order of
restitution under this section shall direct the defendant to pay the victim . . . the full amount of
the victim's losses as determined by the court[.]"  18 U.S.C. § 2259(b)(1).  The "full amount of
the victim's losses" includes any costs incurred by the victim for, among other things, medical
services, lost income, attorney's fees and "other costs incurred," and "any other losses suffered
by the victim as a proximate result of the offense."  18 U.S.C. § 2259(b)(3).  These costs also
include the future costs of treatment and therapy.  *United States v. Laney*, 189 F.3d 954, 966 (9th
Cir. 1999) ("Section 2259 is phrased in generous terms, in order to compensate victims of sexual
abuse for the care required to address the long term effects of their abuse").

Further, the statute provides that, "[a]n order of restitution under this section shall be
issued and enforced in accordance with section 3664 in the same manner as an order under
section 3663A."  18 U.S.C. § 2259(b)(2).  Issues related to restitution "shall be resolved by the
court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of
the loss sustained by a victim as a result of the offense shall be on the attorney for the
Government."  18 U.S.C. § 3664(e).  Moreover, "the economic circumstances of the defendant"
is not a valid reason to decline to issue an order of restitution.  18 U.S.C. § 2259(b)(4)(B)(i).  Nor
may a court decline to issue a restitution order due to "the fact that a victim has, or is entitled to,
receive compensation for his or her injuries from the proceeds of insurance or any other source."
18 U.S.C. § 2259(b)(4)(B)(ii).

In *United States v. Paroline*, 572 U.S. 434 (2014), the Supreme Court addressed the issue of restitution under 18 U.S.C. § 2259 for defendants convicted of possessing images of child pornography.  It recognized a pervasive problem of child pornography: the demand for child pornography harms children in part because it drives production, which involves child abuse. "The harms caused by child pornography, however, are still more extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by [its] circulation.'" *Id*. at 440 (*quoting Ferber*, 458 U.S. at 749).  The Court opined, "where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  *Id*. at 458.

"There are a variety of factors district courts might consider in determining a proper amount of restitution." *Id.* at 459.  "[D]istrict courts might, *as a starting point*, *determine the amount of the victim's losses caused by the continuing traffic in the victim's images*" and "then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses," which include: (1) "the number of past criminal defendants found to have contributed to the victim's general losses;" (2) "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;" (3) "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);" (4) "whether the defendant reproduced or distributed images of the victim;" (5)

14

"whether the defendant had any connection to the initial production of the images;" (6) "how many images of the victim the defendant possessed;" and (7) "other facts relevant to the defendant's relative causal role." *Id*. (emphasis added).  The Court further noted that the government "could also inform district courts of restitution sought and ordered in other cases." *Id*. at 460.

The Sixth Circuit approved of this approach to calculate restitution amounts, and specifically affirmed a restitution order of $15,500 for the victim depicted in the "Vicky" Series. *United States v. Reynolds*, 626 F. App'x 610, 620 (6th Cir. 2015) (noting the district court properly considered the *Paroline* factors to reach its restitution order amount).  In *Reynolds*, the district court used $1,000 as a baseline restitution amount for each victim.  It then adjusted upwards, based on the number of images possessed and the graphic and sadistic nature of those images.  *Id.*

Likewise, in *United States v. Hargrove*, 714 F.3d 371 (6th Cir. 2013), a possession case, the Sixth Circuit noted that a "defendant is not responsible for harm that occurred before the date of his offense."  *Hargrove*, 714 F.3d at 375; *see also United States v. Gamble*, 709 F.3d 541, 554 (6th Cir. 2013) ("As a logical matter, a defendant generally cannot cause harm prior to the date of his offense.").  In *Hargrove*, the court found that "[c]osts for the harms [the defendant] proximately caused that are 'clearly traceable' to him – such as the victims' attorney's fees incurred in seeking restitution in this case – may be assessed directly to him."  *Hargrove,* 714 F.3d at 375.  Finally, the Sixth Circuit held that "where the court must allocate restitution for aggregate harm caused by multiple defendants, the court may, as one option, apportion the

15

restitution award using the formula described in the government's appellate brief and approved by this court in *Gamble*."[1] *Id.*

### 2. Defendant's receipt, distribution, and/or possession of the victims' sexual exploitation proximately caused the victims' harm.

In this case, the National Center for Missing and Exploited Children identified 10 victims. Seven of those victims have submitted requests for restitution: the victim from the "At School" series, "Jenny," "Pia" from the "Sweet Sugar Series," "Cindy," "Lily,"[2] "Tara," and the victim from the "2crazygurls" series.[3] *See* (R. 16: PSR, PageID ¶ 96). After careful consideration of each request, and in accordance with *Paroline*, the United States recommends that this Court order restitution in the amount of $10,000 for the victim in the "At School" series, $3,000 for "Jenny," $5,000 for "Pia" from the "Sweet Sugar Series," $8,000 for "Cindy,"

---

[1] In *Gamble*, a possession and receipt case, the Sixth Circuit held that it was reasonable for a district court to apportion restitution by first determining the relevant "pool" of each victim's provable losses that are not traceable to a single defendant. *Gamble*, 709 F.3d at 554. The court may then determine how much of the pool a given defendant caused by excluding any losses incurred prior to the offense date and then dividing the remaining loss by the number of defendants convicted of possessing that image. *Id.* The Sixth Circuit noted that this approach was reasonable, but it was "not necessarily the only way to calculate restitution." *Id.* Although *Gamble* was decided before *Paroline*, it is consistent with *Paroline*, at least insofar as the apportioning does not "result in trivial restitution orders." *See Paroline*, 572 U.S. at 460.

[2] The victim previously referred to as "Vicky" has elected to change her pseudonym to "Lily" as a way of further distancing herself from the persona that the online consumers of her images and videos seem to fixate upon. *See* (R. 16-7: Restitution Request, PageID 653). Her restitution request is referred to as "Vicky" in the PSR, (R. 16: PSR, ¶ 96, PageID 66), but she is addressed as "Lily" in this memorandum.

[3] Initially, probation received restitution requests from three victims depicted in the "Sweet Sugar Series," however, law enforcement confirmed that only "Pia" appears in the three "Sweet Sugar Series" files found in Defendant's child pornography collection. Therefore, the total restitution amount is $10,000 less than the amount in the PSR to account for the fact that two of the victims from the "Sweet Sugar Series," who each requested $5,000 in restitution, are not depicted in the "Sweet Sugar Series" files in Defendant's collection. *See* (*id.*).

$10,000 for "Lily," $18,136.40 for "Tara," and $10,000 for the victim from the "2crazygurls" series, totaling $64,136.40.

The *Paroline* standards for causation have been met in this case. By receiving, distributing, and/or possessing images of the victims, Defendant was indisputably "part of the overall phenomenon that caused [the victims'] general losses." *Paroline*, 572 U.S. at 457. Anyone who reproduces, distributes, or possesses the images of the victim's abuse "plays a part in sustaining and aggravating" the harm to the victim. *Id.* Moreover, *Paroline* noted the significant harm caused by distributors like Defendant because "every viewing of child pornography is a repetition of the victim's abuse," *id.* at 457, and distributors "may have caused hundreds or thousands of further viewings." *Id.* at 454. Further, a victim need not know about a particular defendant's actions. Thus, Defendant was a cause-in-fact of the victims' harms.

Likewise, Defendant was also a proximate cause of these harms. "[T]he victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes." *Id.* at 449. Similarly, "the list of recoverable losses that the statute provides confirms the breadth of what is a foreseeable consequence of defendants' actions." *Gamble*, 709 F.3d at 549. These foreseeable consequences include, but are not limited to, the costs resulting from mental distress and "attorneys' fees incurred in the reasonable effort to obtain restitution." *Id.* at 550. The proximate cause requirement is met here, for the same reasons it was satisfied in *Paroline*: "the cause of [the victims'] general losses is the trade in [their] images." *Paroline*, 572 U.S. at 449. Moreover, "it is indisputable that [Defendant] was a part of the overall phenomenon that caused [the victims'] general losses." *Id.* This is because the unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victims' abuse—including Defendant—

17

"plays a part in sustaining and aggravating" the tragedy. *Id.* Restitution is mandatory for crimes like this "to impress upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims." *Id.* The seven victims seek restitution for costs that were a direct and foreseeable result of child pornography crimes like the ones Defendant committed; thus, proximate causation has been established.

The Court must then determine the proper amount of restitution to be paid by Defendant. Because the United States has shown both that Defendant possessed, received, and/or distributed the victims' sexual abuse images and the victims have outstanding losses caused by the continuing traffic in those images, the Court should order restitution in an amount that comports with Defendant's relative role in the causal process that underlies the victims' general losses. *See Paroline*, 572 U.S. at 457.

Although the "starting point" set forth in *Paroline* is to "determine the amount of the victim's losses caused by the continuing traffic in the victim's images" and "then set an aware of restitution in consideration of factors that bear on the relative causal significant of the defendant's conduct in producing those losses," *Paroline*, 572 U.S. at 460, "this theoretical starting point . . . simply [does] not exist in many cases." *United States v. Reynolds*, Case No. 12-20843, 2014 WL 4187936, at *6 (E.D. Mich. Aug. 22, 2014). It is simply not possible to show "as a starting point," the amount of losses caused by the "continuing trafficking" in these victims' images. *See id.* Because the suggested "starting point" does not logically exist here, this Court may still consider the other factors discussed in *Paroline*. *See id.*

Similarly, the second—reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses—and third—any available and reasonably reliable estimate of the broader number of offenders involved (most of

whom will, of course, never be caught or convicted—*Paroline* factors pose similar concerns.  To the extent known by the United States, the number of restitution orders per victim are discussed below.  This number, however, does not begin to encompass a reasonable prediction of the number of future offenses or the broader number of offenders involved.  The ease with which child pornography can now be downloaded creates "an expanding market for child pornography [that] fuels greater demand for perverse sexual depictions of children, making it more difficult for authorities to prevent their sexual exploitation and abuse."  *United States v. Reingold*, 731 F.3d 204, 217 (2d Cir. 2013) (internal citations omitted).

Specifically, "Violet" from the "At School" series provided documents to support losses of $794,118.35, which includes a range of $72,400 to $118,025 in future counseling costs as a result of her anticipated understanding of the existence of the distribution of images of her sexual abuse, $647,807 in projected costs for increased medical care attributable to image exploitation and disaggregated from ordinary medical care, together with $28,286.35, in expenses related to her restitution requests.  (R. 16-3: Restitution Request, PageID 173).  As of date of filing, the United States is aware that "Violet" has received 95 restitution orders, ranging from $1,000 to $11,500.  Based on the NCMEC report, Defendant's child pornography collection included four videos depicting this victim.   As a result of Defendant's relative role in the causal process that underlies her general losses, "Violet" requests $10,000 in restitution, which is supported by forensic psychological reports, medical examination reports, and counsel's affidavit of legal costs.  (*Id.*, PageID 183-314).

Similarly, "Cindy" provided her current documented economic losses, which total $1,608,707.58.  (R. 16-4: Restitution Request, PageID 328-29)  The restitution request details specific costs, including counseling and medical expenses of $309,869.38, and future lost

earnings of $1,185,332, among others.   (*Id.*).  This figure does not account for necessary ongoing and future counseling and educational expenses.  (*Id.*, PageID 328).  "Cindy" first became aware at age 15 of the distribution and viewing of images of her sexual abuse on the Internet.  As a result, her teen and young adult years "have been extremely tumultuous."  (*Id.*, PageID 329).  From age 15 until present, "Cindy" has been in and out of hospitals, psychiatric facilities, group homes, and individual counseling.  She has taken medication, struggled with eating disordered, anxiety, and depression.  She also attempted to commit suicide at least four times.  As such, she "faces substantial future counseling costs to repair the damage done by the past and continued possession of images depicting her abuse."  (*Id.*, PageID 330).  Although "Cindy" has tried to work several jobs, her depression, anxiety, and difficulty with body image, have prevented her from sustaining prolonged employment.  (*Id.*, PageID 331).  Attached to her restitution request is nearly 160 pages of documents to support losses she has incurred thus far.  *See* (*id.*, PageID 337-494).  "Cindy" also provided her psychological evaluation, a vocational rehabilitation evaluation, an affidavit from her attorney detailing that she has incurred $92,171.50 in attorney's fees as of June 20, 2016, and a detailed accounting of expenses incurred by her attorney.  *See* (R. 16-5: Attachments, PageID 499-604).  As of date of filing, the United States is aware that "Cindy" has received 453 restitution orders, ranging from $69.64 to $1,608,707.  Based on the NCMEC report, Defendant's child pornography collection included two images depicting "Cindy."  As a result of Defendant's relative role in the causal process that underlies her general losses, "Cindy" requests $8,000 in restitution, acknowledging that "[t]his amount fails to reflect the totality of harm caused by the defendant, but it at least addresses some of the harm caused by the defendant's conduct."  (*Id.*, PageID 335).

20

The victim in "2crazygurls" also provided a psychological evaluation summary with her restitution request, which notes that "[s]ince age 9, she has been impacted by the invasive chronic sexual abuse and photographic exploitation by men and the on-going distribution of her sexual photographic images reportedly exchanged throughout the world, including hundreds of individuals arrested in the United States with her images."  (R. 16-1: Psychological Evaluation Summary, PageID 79).   This victim is diagnosed with post-traumatic stress disorder, major depressive disorder, and polysubstance drug use.  "[H]er prognosis is good but will likely require a lifelong journey of mental health treatment."  (*Id.*, PageID 80).  Her projected mental health needs and costs "over the next 20-plus years" include approximately $60,000 for psychotherapy, $30,000 for psychiatric treatment, $40,000 for family and collateral therapy, $40,000 for marital/couples therapy, $6,375 for sexual abuse/exploitation support and treatment groups, and from $50,000 to $100,000 for educational costs due to psychiatric problems.  (*Id.*, PageID 80-81).  Additionally, the victim's attorney estimates that legal fees and expenses proximately caused by Defendant is $4,625.  (R. 16-1: Affidavit, PageID 90-91).  The victim's total coverable loses are at least $226,375 to $276,375, and the Court may find at least twice that amount, to be $452,750 to $552,750.  (*Id.*, PageID 93).  "[A]dding the 'but for' amount ($4,625.00) to the 'relative causal role' amount would merit for an Order of Restitution of not less than $10,000" for this victim.  (*Id.*).  As of date of filing, the United States is aware that this victim has received 1 restitution award for $2,000.  Based on the NCMEC report, Defendant's child pornography collection included two videos depicting this victim.  As a result of Defendant's relative role in the causal process that underlies her general losses, this victim requests at least $10,000 in restitution.

Similarly, "Jenny's" economic losses likely exceed $1,000,000.  (R. 16-2: Restitution Request, PageID 98).  As indicated in her psychological evaluation, "[t]he fact that [her sexual abuse] images are on the internet and are being repeatedly downloaded means that she cannot get beyond her abuse.  Each downloading causes additional trauma."  (*Id.*, PageID 118).  "Jenny" suffers from PTSD, and will need ongoing psychological treatment, although "no treatment models have been developed to deal with this particular type of sexual victimization."  (*Id.*, PageID 119).  Moreover, although "Jenny" received some treatment when her sexual exploitation was first discovered, it did not likely address the bestiality and bondage which were part of her sexual abuse.  (*Id.*)  As such, "Jenny" requires "immediate treatment and will require intermittent treatment over her life course."  (*Id.*)  Her child pornography exploitation has also impacted her long-term vocational prospects.  (*Id.*, PageID 120).  As of date of filing, the United States is aware that "Jenny" has obtained 11 restitution orders, ranging from $500 to $11,000.  According to the NCMEC report, Defendant's child pornography collection included three videos depicting "Jenny."  In one of the three videos, "Jenny" is depicted engaging in oral sex with a dog.  As a result of Defendant's relative role in the causal process that underlies her general losses, "Jenny" requests at least $3,000 in restitution.

"Pia" faces similar losses.  As described in her forensic psychological evaluation, "Pia" needs to see a therapist for at least two years, and will need to have access to this therapist at each critical developmental juncture.  (R. 16-6: Restitution Request, PageID 642).  Realistically, to attend therapy regularly, "Pia" will need transportation.  (*Id.*).  The total estimated cost of recommendations associated with therapy, and vocational assessment and counseling, is $91,900.  (*Id.*, PageID 643).  Her attorney notes that she has represented "Pia" since September 2016, and as of March 22, 2017, the costs associated with claims for restitution

total $10,187.13.  (*Id.*, PageID 648).  According to the NCMEC report, Defendant's child pornography collection included one image and two videos depicting "Pia."  As of the date of filing, the United States is aware that there are 60 restitution orders specifically for "Pia," ranging from $250 to $7,222.  She has received $46,691.44 in restitution payments as of August 30, 2018. (*Id.*, PageID 607).  As a result of Defendant's relative role in the causal process that underlies her general losses, "Pia" requests $5,000 in restitution.

"Tara" has also submitted documentation support her restitution request, noting that she has $18,136.40 in unreimbursed expenses relating to counseling, transportation to and from counseling sessions, and associated costs.  (R. 16-17: Restitution Request, PageID 1097).  Her total losses incurred thus far related to counseling is $37,008.78, and she has received $18,872.38 as of November 19, 2018.  (*Id.*).  Defendant's child pornography collection included six images and four videos depicting "Tara."  As of the date of filing, the United States is aware that "Tara" has received seven restitution orders, ranging from $500 to $4,000.  As a result of Defendant's relative role in the causal process that underlies her general losses, "Tara" requests $18,136.40 in restitution.

Finally, in her restitution request, "Lily" provides that the full amount of her economic losses is $3,266,093 in disaggregated increased medical costs, up to $164,475 in future counseling expenses, $53,330 in educational and vocational counseling needs and lost part-time income during schooling, $936,646 in lost past and future earnings, and $96,846.13 in expenses paid in out-of-pocket costs incurred relative to restitution documentation.  This totals $4,517,390.13, and does not include attorney fees allowable by statute.  As of August 23, 2018, "Lily" has received $1,421,191.18 as a result of 1056 restitution orders.  (R. 16-7: Restitution Request, PageID 654).  Defendant's child pornography collection included five videos depicting

"Lily."  As a result of Defendant's relative role in the causal process that underlies her general losses, "Lily" requests $10,000 in restitution.

These victims indisputably suffered, and continue to suffer, harm from the continued trafficking of their images.  They have provided the Court with very detailed information documenting the nature and amount of that harm.  Their losses are recognized under the restitution statute, and Defendant's actions were indisputably a part of that harm.  Because "[i]t is perhaps simple enough for the victim to prove the aggregate losses, including the costs of psychiatric treatment and lost income, that stem from the ongoing traffic in her images as a whole[,]" *Paroline*, 572 U.S. at 449, the seven victims seeking restitution have provided the Court with ample documentation of their general losses.  Therefore, the Court should award each victim an appropriate amount of restitution based on Defendant's relative role in the causal process that underlies the victims' general losses, as set forth above, totaling $64,136.40.

## III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence Defendant within the Guidelines range of 151 to 188 months and order $64,136.40 in restitution.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:    /s/ Danielle K. Angeli
       Danielle K. Angeli (MI: P81362)
       Michael A. Sullivan (NY: 2249993)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3875 / (216) 622-3977
       (216) 522-8354 (facsimile)
       Danielle.Angeli@usdoj.gov
       Michael.A.Sullivan@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of May 2019 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Danielle K. Angeli
Danielle K. Angeli
Assistant U.S. Attorney